# EXHIBIT A

# EXHIBIT A

UNITED STATES v. JOEL BARRY GILLIS,
CR 14-712-SJO

STATEMENT OF FACTS
IN SUPPORT OF ENTRY OF GUILTY PLEAS
BY DEFENDANT JOEL BARRY GILLIS

1. At all times relevant to the charges,

   a. Nationwide Automated Systems, Inc. ("NASI") was a California corporation that operated out of its principal office in Calabasas, California, within the Central District of California. NASI was incorporated in 1996 and held itself out to the investing public as being in the business of placing, operating, and maintaining automated teller machines ("ATM"s). NASI described itself as "an ATM machine provider" that worked with high-traffic retail locations, hotels, casinos, and convenience stores, located throughout the United States.

   b. Defendant JOEL BARRY GILLIS ("defendant GILLIS") was a resident of Woodland Hills, California, within the Central District of California. Defendant GILLIS was the founder and president of NASI and a signatory on its bank accounts. Defendant GILLIS and co-defendant EDWARD WISHNER ("defendant WISHNER") were in charge of NASI and were principally responsible for running its business operations.

   c. Defendant WISHNER was a resident of Woodland Hills, California. Defendant WISHNER was the treasurer, vice-president, and secretary of NASI and a signatory on its bank accounts. Defendant WISHNER also prepared NASI's tax returns.

2. Beginning as early as in or about 2001, and continuing to in or about September 2014, in Los Angeles County, within the Central

District of California, and elsewhere, defendants GILLIS and WISHNER, knowingly conspired to and did execute a scheme to defraud investors:

3. Defendants GILLIS and WISHNER operated their scheme, in substance, as follows:

    a. Defendants GILLIS and WISHNER solicited and caused to be solicited funds from victim-investors by purporting to sell them ATMs through NASI's ATM sale/leaseback program, using a standard package of agreements, comprised of the following: (1) an ATM Equipment Purchase Agreement ("Purchase Agreement"); (2) an ATM Equipment Lease Agreement ("Lease Agreement"); and (3) an Addendum to Owner Lease Agreement ("Addendum").

    b. Under the terms of the Purchase Agreement, victim-investors paid a flat amount – typically $12,000, but in some cases as much as $19,800 per ATM – to buy one or more ATMs, all of which were to be identified in an exhibit ("Exhibit A") to the contract by both "serial number" and by the name of the location to which the ATMs were purportedly to be delivered. In exchange for the victim-investors' payments, NASI, as the supposed "seller" of the ATMs, agreed to deliver the ATMs purportedly purchased by the victim-investor to the location specified by the agreement within 60 days.

    c. Under the terms of the Lease Agreement, victim-investors leased the ATMs they had purchased back to NASI for an initial 10-year term. The Lease Agreement provided that NASI would be responsible for operating and maintaining the ATMs and providing all the services necessary for this purpose, including processing and accounting for all ATM transactions; obtaining, delivering, and loading cash for the ATMs; and repairing, maintaining, and servicing the ATMs. The Lease Agreement further provided that NASI was

obligated to pay a monthly rent to the victim-investor in an amount equal to $.50 for each "approved transaction" produced by the ATMs during the covered month for the term of the lease.

  d. Finally, the Addendum to the Lease Agreement modified NASI's rent obligation by guaranteeing NASI's payment of a monthly check to victim-investors equal to a 20% annual rate of return on the victim-investors' initial investment. NASI guaranteed this 20% annual rate of return even if the number of transactions produced by the victim-investor's ATM was insufficient to provide, at the $.50 per transaction rate, a 20% annual rate of return. The Addendum also modified the 10-year lease term provided for in the Lease Agreement by granting the victim-investor the right, after only two years, to sell their ATMs back to NASI at their original purchase price at any time, thereby recovering their original investment in full.

  e. In marketing NASI's ATM sale/leaseback program to victim-investors, defendants GILLIS and WISHNER touted NASI's purportedly lengthy track record of delivering profitable returns for investors through their management, servicing, and collection of transaction fees from tens of thousands of ATMs that NASI either separately owned or had leased back from investors.

  f. Each month, defendants GILLIS and WISHNER caused monthly transaction reports to be sent to the victim-investors that purportedly detailed the performance of the ATMs that the victim-investors owned. The reported number of transactions of each of the ATMs supposedly formed the financial basis for the monthly payments that NASI sent to the victim-investors. In truth and in fact, as defendants GILLIS and WISHNER then well knew, the purpose of these reports was to falsely confirm to the victim-investors that the

3

payments they were receiving from NASI were being generated by the high-yield transaction fees earned by their particular ATMs, and to conceal that the payments were, in fact, Ponzi payments funded by monies received from other victim-investors.

   g. As defendants GILLIS and WISHNER then well knew, the Purchase Agreement, Lease Agreement, and Addendum packages that NASI entered into with its victim-investors were a sham, and NASI's promises and representations to its victim-investors in connection with its purported sale and leaseback of ATMs were materially false and misleading. In truth and in fact, as defendants GILLIS and WISHNER then well knew, NASI typically did not sell and lease back the ATM machines it purported to sell to its victim-investors, and the serial numbers and the installation locations of the ATMs that were specified on the Exhibits A to the victim-investors' Purchase Agreements were fabricated by defendant GILLIS and by NASI to create the false impression that NASI was selling actual ATMs that were installed in favorable locations throughout the United States. As defendants GILLIS and WISHNER also then well knew, NASI did not own or operate the tens of thousands of ATMs that it claimed to have sold and leased back from its victim-investors, nor did it generate any transaction fees or revenue from the ATMs it purportedly leased back from investors and supposedly installed in favorable locations.

   h. In truth and in fact, defendants GILLIS and WISHNER operated NASI as a Ponzi scheme, in which the vast majority of its incoming revenue was comprised of victim-investor funds, which defendants GILLIS and WISHNER used to pay returns to prior victim-investors, finance NASI's operations, and pay compensation to themselves and to NASI's sales agents and employees. Not only were

the tens of thousands of ATMs that defendants GILLIS and WISHNER purported to sell to, and lease back from, NASI victim-investors never owned or operated by NASI, in the vast majority of cases these ATMs never even actually existed, as defendants GILLIS and WISHNER then well knew.

i. By means of the false and fraudulent pretenses, misrepresentations, and promises identified above, and others, defendants GILLIS and WISHNER caused victim-investors to send money to NASI using the United States mails and commercial interstate carriers and by means of interstate wirings, which money the victim-investors believed was being used to purchase ATMs as part of NASI's ATM sale/leaseback program.

j. In furtherance of their fraudulent investment scheme, defendants GILLIS and WISHNER would cause co-conspirator NASI to send to the victim-investors, using the United States mail, false monthly transaction reports for the ATMs purportedly owned by the victim-investors. These monthly transaction reports set out in detail the fabricated ATM transaction fees supposedly generated by the non-existent ATMs that NASI had purportedly sold to and leased back from the victim-investors.

k. In and about August 2014, after checks that had been sent by NASI as monthly returns to victim-investors bounced, defendants GILLIS and WISHNER falsely sought to reassure the victim-investors that NASI was only suffering from accounting problems and technical delays relating to system upgrades, and that timely payment of investor returns would likely resume by the beginning of October 2014. In truth and in fact, as defendants GILLIS and WISHNER then well knew, their Ponzi scheme was collapsing owing to a shortfall in

new victim-investor funds. Nonetheless, between in and about the last week in August and in and about the end of the first week of September 2014, defendants GILLIS and WISHNER, acting in concert with NASI sales agents and employees, continued raising nearly $4 million in additional new victim-investor money and making Ponzi payments to lull existing victim-investors, who were owed returns under NASI's Purchase and Lease Agreements.

4. In furtherance of the conspiracy and fraudulent scheme, on or about the following dates, defendants GILLIS and WISHNER caused a person working for defendant WISHNER to make the following deposits into NASI's City National Bank account x4410 (the "NASI CN Bank Account"):

a. On January 13, 2010: seven checks received from seven victim-investors for a total deposit of $246,300;

b. On or about March 29, 2011: 28 checks received from 28 victim-investors for a total deposit of $1,094,400.

c. On or about January 31, 2012: 27 checks received from 25 victim-investors for a total deposit of $2,219,600.

d. On or about February 1, 2013: 41 checks received from 33 victim-investors for a total deposit of $1,329,124.

e. On or about August 4, 2014: two checks received from one victim-investor for a total deposit of $936,000.

As a result of the false representations, pretenses and promises and concealments of material facts described above as part of the conspiracy and fraudulent scheme devised and executed by defendants GILLIS and WISHNER, defendants GILLIS and WISHNER caused victim-investor D.H. to mail a check for $468,000 payable to NASI from Santa Monica, California, to NASI in Calabasas, California, on or about

```
 1  October 24, 2013; caused victim-investor J.H. to mail a check for
 2  $120,000 payable to NASI from Hidden Hills, California, to NASI in
 3  Calabasas, California, on August 26, 2014; and, caused $1,000,000, to
 4  be wired  for the benefit of victim-investor A.K., from Citibank
 5  account number x00089 in New York, New York, to the NASI CN Bank
 6  Account in California, by means of wire and radio communication in
 7  interstate and foreign commerce on or about July 30, 2013.
 8
 9         I have read this EXHIBIT A: STATEMENT OF FACTS IN SUPPORT OF
10  ENTRY OF GUILTY PLEAS in its entirety.  I have had enough time to
11  review and consider this Statement of Facts, and I have carefully and
12  thouroughly discussed every part of it with my attorney.  I represent
13  and admit that the facts set forth in this Statement of Facts are
14  true and I agree that this statement of facts is sufficient to
15  support pleas of guilty to the charges described in the information
16  filed in United States v. Joel Barry Gillis, CR 14-712-SJO.
17
18  [signature]                              1-2-15
    JOEL BARRY GILLIS                        Date
19  Defendant
```